**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| Estate of Timothy Barnett, by and through Elizabeth Ann Barnett, as Personal Representative, <br><br> Plaintiff, <br><br> v. <br><br> SNAP Inc., <br><br> Defendant. | Case No.:    3:24-cv-3069-SAL <br><br> **COMPLAINT** <br> **(SURVIVAL ACTION)** |

Plaintiff Estate of Timothy Barnett ("Plaintiff"), by and through its Personal Representative Elizabeth Ann Barnett, brings this action against Defendant Snap Inc. ("Snap" or "Defendant") pursuant to the South Carolian Survival Statute, S.C. Code Section 15-5-90 and alleges as follows:

### INTRODUCTION

1.     This is an action for the wrongful death of 13-year-old Timothy Isaiah Barnett, who died by suicide on April 6, 2023, after being the victim of sextortion on Snap's social media platform, Snapchat.

2.     Snapchat is defectively designed with features that make the platform unreasonably dangerous for minors like Timothy. Snap failed to implement adequate age verification and other safeguards to protect vulnerable minor users from connecting with and being exploited by adult predators.

3.     As a direct and foreseeable consequence of Snap's unsafe design, lack of warnings, and inadequate parental controls, Timothy fell victim to a sexual predator who extorted him by threatening to share sexually explicit images Timothy had been manipulated into sending via Snapchat. Unable to cope with the trauma, shame and fear of exposure, Timothy took his own life.

4.      Plaintiff seeks to hold Snap accountable for its reckless disregard for the safety of minor users like Timothy and the grievous harm caused by its defective product. Plaintiff brings claims for strict liability design defect, failure to warn, negligence, and wrongful death, seeking compensatory and punitive damages.

**PARTIES**

5.      Plaintiff Estate of Timothy Barnett is the estate of decedent Timothy Barnett. Elizabeth Ann Barnett is Timothy's mother and has been appointed as Personal Representatives of his estate. Timothy was domiciled in Sumter, South Carolina at the time of his death.

6.      Defendant Snap Inc. (Snap) is a Delaware corporation with its principal place of business in Santa Monica, California. Snap owns, operates, controls, produces, designs, maintains, manages, develops, tests, labels, markets, advertises, promotes, supplies, and distributes the app Snapchat. Snapchat is widely available to consumers throughout the United States.

**FACTS**
**Background**

7.      It is well documented that sexual predators use Defendant's product to target and exploit minors. They are drawn to social media because it provides them with easy access to a large pool of potential victims, many of whom are addicted to Defendant's product.

8.      On February 7, 2023, for example, the FBI and international law enforcement agencies issued a joint warning about the global "financial sextortion crisis" which stated: "Financial sextortion can happen anywhere, although it mainly occurs on the digital platforms where children are already spending their screen time, like social media and gaming websites, or video chat applications. On these platforms, predators often pose as girls of a similar age and use fake accounts to target young boys, deceiving them into sending explicit photos or videos. The predator

then threatens to release the compromising materials unless the victim sends payment, however, in many cases, the predator will release the images anyway."

9.      Rather than mitigate the risk of sexual exploitation and harm to children and teens on its product, Defendant has facilitated and exacerbated it by implementing defective product features that help sexual predators connect with children.

10.     Defendant's product is designed in unsafe ways—including, as to some or all Defendants, flawed age verification, lack of meaningful mechanisms to prevent sham accounts, default-public profiles, matching and recommending connections between adults and minors, promoting unsolicited messages and interactions from adults, and wholly inadequate and ineffective parental controls, among others—that allow children to be easily identified, targeted, accessed, and exploited.

11.     Compounding the problem, Defendant routinely fails to report abuse. Steve Grocki, the U.S. Department of Justice's Chief of the Criminal Division's Child Exploitation & Obscenity Section, put it this way: "A lot of times, someone has come across something problematic and the platform isn't doing anything[.]" He went on to say, "[t]hese reports can be of great value because they signal where there are big problems and we can flag those issues to Internet companies, such as when products are being exploited by offenders, they aren't meeting reporting requirements, or when children under the age restriction are accessing inappropriate content."

12.     By failing to implement adequate age and identity verification on the product, Defendant knowingly and foreseeably places children in the pathways of sexual predators, who utilize its product and exploit the defective design features. Age verification on Defendant's product can be defective for a variety of reasons, including:

     a.      Inaccurate information: Users can easily enter false information, such as a fake date of birth, to bypass age restrictions;

     b.      No measures to prevent sham accounts: Defendant's product is structured so that users can easily create multiple accounts under different names and ages; and

     c.      Incomplete implementation: Defendant's product only partially implements age verification, such as requiring users to provide their date of birth but not verifying it through any means.

13.    Defendant possesses the technology to identify minors who are posing as adults and adults who are posing as minors, but it does not use this information to identify violative accounts and remove them from their products.

14.    For example, by making minors' profiles public by default, Defendant has supplied sexual predators with detailed background information about children, including their friends, activities, interests, and even location. By providing this information, the Defendant puts children at risk of being approached and befriended by sexual predators. These young targets had no idea that their posts, friends, pictures, and general online sharing represented a windfall of information that a predator could use to sexually exploit or abuse them.

15.    Defendant's parental controls are also defective in giving parents effective control over their children's online activity, which can lead to kids connecting with predators. These defects take several forms:

     a.      Limited scope: parental control tools only partially cover a child's activity, leaving gaps that predators can exploit;

     b.      Inadequate monitoring: parental control tools do not provide real-time monitoring of a child's activity, meaning that harmful interactions with predators go unnoticed;

     c.      Lack of customization: parents are not able to fully customize their parental control settings to meet the specific needs of their family and children, leaving them with

a one-size-fits-all solution that is wholly ineffective in preventing connections with predators; and

d.    Opt-in format: parental control tools that require parents to affirmatively link to their child's account are futile when parents are not notified that their minor child has opened an account on the platform in the first place.

16.    Defendants is well aware that vulnerable young users—whom Defendant induces to spend large amounts of time on their products through a powerful combination of algorithmic recommendations and addictive features designed to make it hard for a user to disengage—are uniquely susceptible to grooming by seasoned sexual predators. Research shows that young users are heavily reliant on their social connections—exploring and shaping their identity through their social relationships.

17.    Snapchat's "Snap" feature allows users to send and receive ephemeral, or "disappearing," audiovisual messages. Prior to sending a Snap, a user can designate the period of time—typically no more than a few seconds—that the recipient will be allowed to view the Snap. According to Snapchat, once the allotted time expires, the Snap disappears forever.

18.    Snapchat's limited display time reduces teenagers' communication apprehension and encourages users to send photos depicting deviant behavior. Sexting is a prime example, but cyberbullying, underage alcohol consumption, and illicit use of narcotics are also commonly the subject of Snaps. A 2016 survey of pre-teens and teens ages 12-17 found that "dick pics" were among some of the unwanted content that users—predominantly females—received while using the app.

19.    Disappearing Snaps do not operate as advertised. Although designed to disappear after an allotted time, recipients possess the ability to save or record them at will. This is particularly harmful to adolescents, who rely on Snap's representations when taking and sending photos, and

who only learn after the fact that recipients have the means to save photos or videos. In many cases, this leads to sexual exploitation.

20.     Snap could, but does not, warn users, including children and teenagers, that Snaps may not necessarily disappear.

21.     In addition, and especially for pre-teen users, Snaps are defective because Snap's parental controls are ill-equipped to mitigate the risks posed by this feature. Even with parental controls activated, parents are unable to view a Snap's content and therefore cannot adequately protect their children and/or deter their children from engaging in dangerous behavior in conjunction with sending Snaps.

22.     Defendant's defective product features have benefited sexual predators in many other ways as well. For example, sexual predators leverage Defendant's use of ephemeral, "disappearing" technology to assure young users that there is no risk to them sending a sexual photo or video. Trusting young users are then horrified to discover that these videos have been captured by predators and then circulated to their own friends and contacts or other sexual predators.

23.     "My Eyes Only" is yet another defective feature of Snapchat. This feature enables and encourages users to hide harmful content from their parents in a special tab that requires a passcode. Content cannot be recovered from "My Eyes Only"—allegedly even by Snap itself.

24.     Snap designed "My Eyes Only" knowing it would likely be used to store potentially illegal and injurious photos and images like sexts. This dangerous product feature unreasonably increases the risk that Snapchat's adolescent users, many under age 13, will be targeted and sexually exploited and/or trafficked by child predators.

25.     The content in "My Eyes Only" self-destructs if a user attempts to access the hidden folder with the wrong code. "My Eyes Only" has no practical purpose or use other than to hide potentially

dangerous content from parents and/or legal owners of the devices used to access Snapchat. Moreover, while this information and evidence should be in Snap's possession and control, it has designed this feature in a way that causes the permanent loss of relevant, material, and incriminating evidence.

26.     In some severe cases, young users such at the decedent Timothy Barnett find themselves in the nightmarish scheme known as "sextortion," where a predator threatens to circulate the sexual images of the minor unless the predator is paid to keep the images under wraps.

27.     Law enforcement agencies across the country report that this scheme has become pervasive on Defendant's product.

28.     As a direct and foreseeable consequence of Defendant's connecting children to sexual predators, Defendant's products facilitates and increases the risk of sexual exploitation, sexual abuse, and sextortion of children.

29.     Thirteen-year-old Timothy Barnett was a victim of sexual exploitation that the Defendant knowing facilitated on its Snap media platform.

30.     Timothy was an honors student, athlete, and musician who loved baseball, karate and playing the saxophone. He was a happy, outgoing child with a bright future ahead of him.

31.     In early 2023, Timothy became the victim of sextortion through Snapchat, when an adult predator posing as a young girl manipulated Timothy into sending sexually explicit images and then threatened to share those images unless Timothy met the predator's demands.

32.     Overwhelmed by shame, trauma, and fear that the images would be publicly exposed, Timothy committed suicide on April 6, 2023. He was found deceased in his home.

**JURISDICTION AND VENUE**

33.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. Section 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendant are residents of different states.

34.    This Court has personal jurisdiction over Defendant Snap Inc. under South Carolina's Long-Arm statute, S.C. Code Section 36-2-803, because Defendant regularly conducts business in this State and derives substantial revenue from goods and services used or consumed in South Carolina, has entered into contracts to be performed in whole or in part in this State and the cause of action arises from Timothy's use of Snapchat in South Carolina.

35.    Venue is appropriate in this District because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in South Carolina.

**FIRST CAUSE OF ACTION**
**(STRICT LIABILITY – DESIGN DEFECT)**

36.    Plaintiff realleges and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

37.    At all relevant times, Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its products used by Plaintiff's decedent.

38.    Defendant's product is designed and intended to be social media products.

39.    Defendant's product is distributed and sold to the public through retail channels (i.e., the Apple App "Store" and the Google Play "Store").

40.    Defendant's product is marketed and advertised to the public for the personal use of the end-user / consumer.

41.     Defendant defectively designed its product to addict minors and young adults, who were particularly unable to appreciate the risks posed by the products, and particularly susceptible to harm from those products.

42.     The defects in the design of the Defendant's product existed prior to the release of these products to Plaintiff and the public, and there was no substantial change any of the Defendant's products between the time of their upload by each Defendant to public or retail channels (e.g., the App Store or Google Play) and the time of their distribution to Plaintiff's decedent via download or URL access.

43.     Plaintiff used the product as intended, and Defendant knew or, by the exercise of reasonable care, should have known that Plaintiff would use these products without inspection of it's addictive and harmful nature.

44.     Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harms.

45.     Defendant failed to test the safety of the features it developed and implemented for use on its product.

46.     When Defendant did perform some product testing and had knowledge of ongoing harm to Plaintiff and others, it failed to adequately remedy its product's defects or warn Plaintiff.

47.     Defendant's product is defective in design and pose a substantial likelihood of harm for the reasons set forth herein, because the product fails to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the product is less safe than an ordinary consumer would expect when used in such a manner. Children and teenagers are among the ordinary consumers of each of the Defendant's product.

48.    Indeed, Defendant markets, promotes, and advertises its product to pre-teen and young consumers. Pre-teen and young consumers, and their parents and guardians, do not expect Defendant's product to be psychologically and neurologically addictive when the product is used in its intended manner by its intended audience. They do not expect the algorithms and other features embedded by Defendant in its product to make it initially and progressively more stimulative, to maximize young consumers' usage time.

49.    They do not expect each Defendant's revenues and profits to be directly tied to the strength of this addictive mechanism and dependent on young consumers spending several hours a day using its products.

50.    Defendant's product is likewise defectively designed in that it creates an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include but are not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self- worth, increased risky behavior, exposure to predators, sexual exploitation, and profound mental health issues for young consumers including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

51.    The risks inherent in the design of the Defendant's product significantly outweigh any benefit of such design.

52.    Defendant could have utilized cost-effective, reasonably feasible alternative designs including algorithmic changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

      a.  Robust age verification;

      b.  Effective parental controls;

c.  Effective parental notifications;

d.  Warning of health effects of use and extended use upon sign-up;

e.  Default protective limits to the length and frequency of sessions;

f.  Opt-in restrictions to the length and frequency of sessions;

g.  Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

h.  Blocks to use during certain times of day (such as during school hours or late at night);

i.  Beginning and end to a user's "Feed;"

j.  Redesigning algorithms to limit rather than promote addictive engagement;

k.  Implementing labels on images and videos that have been edited through;

l.  Product features such as "filters;"

m.  Limits on the strategic timing and clustering of notifications to lure back users;

n.  Removing barriers to the deactivation and deletion of accounts;

o.  Implementing freely available and industry-proven child protection API;

p.  Tools such as Project Arachnid Shield to help limit and prevent child sexual exploitation, sextortion, and distribution of known CSAM through their products;

q.  Implementing reporting protocols to allow users or visitors of Defendant's products to report CSAM and adult predator accounts specifically without the need to create or log in to the products prior to reporting;

r.  Implementing the legal definition of CSAM under 18 U.S.C. § 2256(8) and related case law when scanning for CSAM using tools such as PhotoDNA and CSAI to prevent underreporting of known CSAM;

s.  Prioritizing "tolerance" rather than "efficiency" and "distinctness" of the detection model when using scanning tools such as PhotoDNA and CSAI to prevent underreporting of known CSAM;

t.  Implementing client-side scanning and hashing and/or secure enclaves in the direct messaging features of Snap's products, to prevent underreporting of known CSAM, and implementing proactive detection measures to scan for known CSAM within all Defendant's social media products and remove it;

u.  Limiting or eliminating the use of geolocating for minors; and

v.  Eliminating product features that recommend minor accounts to adult strangers.

53.  Alternative designs were available that would reduce minors' addictive and compulsive engagement with the Defendant's product, and which would have served effectively the same purpose of Defendant's product while reducing the gravity and severity of danger posed by those product's defects.

54.  Timothy used Defendant's product as intended or in reasonably foreseeable ways.

55.  That Timothy would become a victim of sextortion using Defendant's Snapchat product and his decision to commit suicide rather than be exposed was reasonably foreseeable to the Defendant at the time of the development, design, advertising, marketing, promotion and distribution of its Snapchat product.

56.     Defendant's Snapchat product was defectively and unreasonably dangerous when it left the Defendant's possession and control. The defects continued to exist through the product's distribution to and use by consumers, including Timothy, who used the product without any substantial change to the product's condition.

57.     Timothy's emotional trauma and death was a direct and proximate result of the Defendant's defective designs as described.

58.     The defective design of the product used by Timothy was a substantial factor in causing harm to him.

## SECOND CAUSE OF ACTION
## (STRICT LIABILITY-FAILURE TO WARN)

59.     Plaintiff realleges and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

60.     Defendant's social media product Snapchat relies on highly complex and proprietary algorithms that are both undisclosed and unknowable to the ordinary consumer who does not expect that social media platforms are physically and psychologically addictive.

61.     The magnitude of harm from addiction to Defendant's product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loos, severe depression, anxiety, self-harm and suicide.

62.     The harms resulting from minors' addictive use of social media platforms have been not only well documented in the professional and scientific literature, but Snap had actual knowledge of such harms.

63.     In fact, Snap has conducted internal studies and surveys documenting that nearly two-thirds of Generation Z teens and young adults, in six countries, said they or their friends have been

targeted in online "sextortion" schemes.( Two-thirds of Gen Z targeted for online "sextortion" - New Snap research - WeProtect Global Alliance)

64.    Defendant's product is unreasonably dangerous because it lacks any warnings that the foreseeable product use can expose the user to sextortion schemes, or information explaining how to avoid such schemes or what to do in the event the user is a victim of a sextortion scheme.

65.    "It is really important to know it's not a hopeless situation" explains Susan Kennedy, the director of community of engagement at the National Center for Missing and Exploited Children in a recent New York Times Article, What to Do If You Are Threatened with Sextortion, May 15, 2024. Ms. Kennedy advises the victim to do the following: 1. Don't pay the scammers; 2) Block the harasser; 3) Tell law enforcement; and 4) Get the photograph taken down, using software like Take It Down.  Ms. Kennedy explains that "we used to tell kids once something is out on the internet it's out there forever—it's not true." Id.

66.    As a result of Defendant's failure to warn, Timothy was a victim of sextortion and he clearly believed the situation was hopeless, so much so, that he took his own life.

67.    Timothy's emotional trauma and death was a direct and proximate result of the Defendant's defective designs as described.

68.    Defendant is therefore liable for actual and punitive damages.

**THIRD CAUSE OF ACTION**
**(NEGLIGENCE PER SE)**

69.    Plaintiff re-alleges and incorporates by reference each of the preceding and succeeding paragraphs as though set forth fully herein.

70.    At all times, Defendant had an obligation to comply with applicable statutes and regulations, including but not limited to the PROTECT Our Children Act (see 18 USC Sections

2258A, 2258B) and COPPA (see 15 U.S.C. Sections 6501-6506, 16 C.F.R. Section 312.2) as well as other federal laws.

71.     Defendant owed a heightened duty of care to minor users and their parents to implement age verification services that were effective and would prevent access by pre-teen users.

72.     Defendant's actions as described herein violated these statues and regulations, as well as other federal laws.

73.     Defendant failed to meet the requirements of 18 U.S.C. Section 2258A by not reporting to NCMEC the violations of child pornography laws that they suspected to be in existence with its product.

74.     Defendant intentionally designed the Snapchat product in an attempt to limit and avoid its reporting requirements under this statute.

75.     Defendant also failed to minimize the numbers of its employees with access to visual depiction of its consumers, including Plaintiff's decedent, in violation of 18 U.S.C. Section 2258B(c).

76.     COPPA establishes certain obligations for operators of websites and online services that are intended to inform parents and guardians about the collection of their children's personal information.

77.     Defendant is an "operator," as defined by 16 CFR Section 312.2.

78.     Defendant collects or uses personal information from children through its websites and/or online services that are directed to (or that Defendant has actual knowledge were used by) children.

79.     Defendant has collected or used personal information from children in violation of COPPA by, at least:

    a.   Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents that described Defendant's practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and

    b.   Failing to make reasonable efforts, taking into account available technology, to ensure parents received such notice on their websites and applications so that parents could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

    c.   Failing to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

80.    Timothy is within the class of persons that these statutes and regulations are intended to protect.

81.    Plaintiff's injuries and/or symptoms are the type of harm that these statutes and regulations are intended to prevent.

82.    Violations of the foregoing statutes and regulations, among others, by Defendant constitutes negligence per se.

83.    As a direct and proximate result of the Defendant's statutory and regulatory violations, Plaintiff's decedent suffered serious emotional trauma, injuries, and death.

**FOURTH CAUSE OF ACTION**
**(NEGLIGENCE)**

84.    Plaintiff realleges and incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein.

85.     At all relevant times, Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its respective products used by Plaintiff's decedent.

86.     Defendant's product was designed and intended to be social media products.

87.     Defendant knew or, by the exercise of reasonable care, should have known, that its product was dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner.

88.     Defendant knew or, by the exercise of reasonable care, should have known that its product posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal data and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

89.     Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff and Plaintiff's decedent would not have realized the potential risks and dangers of the Defendant's product. Those risks include abuse, addiction, and compulsive use in youth which can lead to a cascade of negative effects including but not limited to: dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, exposure to predators, sexual exploitation, and profound mental health issues including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, and death.

90.     Defendant owed a duty to all reasonably foreseeable users to design a safe product.

91.     Defendant owed a heightened duty of care to minor users of its product because children's brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding the frequency and intensity of social media usage.

92.    Plaintiff's decedent was a foreseeable user of the Defendant's products.

93.    Defendant knew that minors such as Plaintiff's decedent would use its products.

94.    Defendant breached its duty in designing its products.

95.    Defendant breached its respective duty by failing to use reasonable care in the design of its products by negligently designing them with features and algorithms as described above that specifically are addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products.

96.    Defendant breached its duty by designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner and by failing to warn consumers of the heighten risks of sextortion created by Defendant's product.

97.    Defendant breached its duty by failing to use reasonable care in the design of its products by negligently designing its products with features and algorithms as described above that created or increased the risk of abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, increased risky behavior, exposure to predators, sexual exploitation, and profound mental health issues including but not limited to depression, body dysmorphia, anxiety, suicidal ideation, self-harm, insomnia, eating disorders, death, and other harmful effects.

98.    Each Defendant breached its respective duty by failing to use reasonable care to use cost-effective, reasonably feasible alternative designs, including algorithmic changes and changes to the addictive features described above, and other safety measures, to minimize the harms described herein. Alternative designs that would reduce the addictive features of Defendant's respective products were available, would have served effectively the same purpose as each of the

Defendant's defectively designed products, and would have reduced the gravity and severity of danger Defendant's respective products posed minors such as Plaintiff's decedent Timothy.

99.    A reasonable company under the same or similar circumstances as Defendant would have designed a safer product.

100.    At all relevant times, Plaintiffs used Defendant's respective products in the manner in which they were intended by Defendants to be used.

101.    As a direct and proximate result of the Defendant's breached duties, Plaintiff's decedent was harmed. Defendant's design of its  product was a substantial factor in causing the Plaintiff's harms and injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant Snap Inc. and award the following relief:

    a)  Compensatory damages in excess of $10 Million for Timothy's pre-death pain and suffering, emotional distress, and loss of enjoyment of life in an amount to be determined at trial;

    b)  Punitive and exemplary damages in an amount sufficient to punish Defendant's willful, wanton and reckless conduct and deter others from engaging in similar misconduct;

    c)  Plaintiff's reasonable attorneys' fees and costs;

    d)  Pre- and post-judgment interest; and

    e)  Any other relief the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully Submitted.

By:     *s/ James M. Griffin*
        James M. Griffin, Esq., Fed. ID No. 1053
        Margaret N. Fox, Esq., Fed. ID No. 10576
        Griffin Humphries, LLC
        4408 Forest Dr., Suite 300
        P.O. Box 999 (29202)
        Columbia, South Carolina, 29206
        (803) 744-0800
        jgriffin@griffinhumphries.com
        mfox@griffinhumphries.com

        Joseph Kendrick Cunningham, Fed. ID No. 11986
        Joe Cunningham Law, LLC
        44 Folly Road, Suite C
        Charleston, South Carolina, 29407
        (843) 633-3360
        joe@joecunninghamlaw.com

Columbia, South Carolina
May 17, 2024